HOLY TRINITY COMMUNITY SCHOOL, INC., Appellant, v.
KAHL, State Superintendent of Public Instruction
of the State of Wisconsin, Respondent.

*No. 75–731. Argued October 5, 1977.—Decided February 7, 1978.*
(Also reported in 262 N.W.2d 210.)

For the appellant there were briefs by *Foley & Capwell, S. C.,* and oral argument by *Garth R. Seehawer,* all of Racine.

For the respondent there was a joint brief by *Bronson C. La Follette,* attorney general, *John William Calhoun,* assistant attorney general, *Thompson & Coates* of Racine, and oral argument by *John William Calhoun.*

HEFFERNAN, J.   This case originated on the petition of the Holy Trinity Community School (Community School) to the Board of the Racine County Unified School District requesting that an attendance area be designated for the school co-extensive with the geographic area of the entire district.

The District School Board denied the Community School's application because the school was affiliated with the Roman Catholic denomination and the requested attendance area would, therefore, have overlapped attendance areas assigned to other Roman Catholic Schools.

The statute under which the petition was authorized, and pursuant to which the school board acted, is sec. 121.51(4), Stats.:

" 'Attendance area' is the geographic area designated by the governing body of a private school as the area from which its pupils attend and approved by the school board of the district in which the private school is located. If the private school and the school board cannot agree on the attendance area, the state superintendent shall, upon the request of the private school and the board, make a final determination of the attendance

area. The attendance areas of private schools affiliated with the same religious denomination shall not overlap."

Upon the denial of the petition, the district school board's determination was submitted to the State Superintendent of Public Instruction.[1] After a hearing, an order was issued by the State Superintendent denying the requested attendance area.

On September 20, 1972, the Community School commenced an action for review in the circuit court for Dane county. For reasons not fully explained, the filing of the record was delayed and briefs were not submitted to the circuit court until September of 1975. Following a hearing in the circuit court for Dane county, a judgment was entered on February 23, 1976, affirming the order of the Superintendent of Public Instruction which dismissed the Community School's petition for a district-wide attendance area.

The case is before us on appeal from the judgment of the circuit court.

On this appeal the parties agree that, if the Community School is not affiliated with a religious denomination, as a private school it is entitled to an attendance area co-extensive with the school district; and, conversely, that, if it is affiliated, its attendance area must be one which does not overlap the attendance areas of other schools in the district affiliated with the same denomination.

It is basically the position of the Community School that the question of religious affiliation or the determination of the denominational fealty of the school is not justiciable in a court of the civil government.

---

[1] William C. Kahl, State Superintendent of Public Instruction, was succeeded in office by Barbara Thompson on July 2, 1973. There has, however, been no formal substitution of the respondent in the pleadings; and, accordingly, in this opinion we refer to the named respondent. The opinion and mandate of this court is, of course, binding upon the present Superintendent of Public Instruction.

The State Superintendent of Public Instruction looks upon this appeal as raising only the routine type of question normally to be expected in a certiorari review, *i.e.,* was the determination a reasonable one under the facts adduced at the hearing.

Although holdings involving the relations between church and state are numerous, the question posed here appears to be unique, for here a concededly private school disclaims any religious affiliation, while the state asserts the school is Catholic.

Arguably at least, the issue posed implicates questions in the sensitive area of relations between church and state.

In Wisconsin, following the Supreme Court case of *Everson v. Board of Education,* 330 U.S. 1 (1947), and the adoption of Art. I, sec. 23, of the Wisconsin Constitution, the authority of the legislature to provide for the transportation of children to and from any parochial or private school is unchallenged.[2] The nature of the school, whether it be public or private, sectarian or not, therefore is irrelevant to its statutory right to receive transportation aids. Accordingly, the numerous cases which can be found in both the state and federal reports which address themselves to the propriety of using public funds for the support of a sectarian institution are irrelevant. Although the Community School were found to be sectarian, transportation aids would be permissible under the Constitutions of Wisconsin and the United States and the statutes of Wisconsin.

---

[2] Art. I, sec. 23, of the Wisconsin Constitution provides:

"Transportation of school children. Section 23. Nothing in this constitution shall prohibit the legislature from providing for the safety and welfare of children by providing for the transportation of children to and from any parochial or private school or institution of learning."

Despite some protestations to the contrary by the Community School, it is clear, from the school's articles of incorporation, that it is a religious school. The by-laws of the corporation provide that, "The school maintained by corporation shall be operated in a Christian-Judeo tradition." Although the bylaws specifically disavow any "affiliation" with any religious denomination, nevertheless, Article 4 of the bylaws states that students are to be encouraged "to practice the religion of their choice."

The record also shows that religious instruction is carried on in the school itself by a released-time program, although the instructors are not members of the school staff.

It is apparent that the school has formally dedicated itself to the promotion of religion in a manner that would not be permitted in a public school, but this fact is irrelevant to the right of a private school to receive transportation aids.

The problem is basically whether this court, for the purpose of determining a school-attendance area, may inquire, and determine, whether the school is affiliated with the Roman Catholic denomination or whether, under the strictures imposed upon government by the First Amendment to the Constitution of the United States, we are required to refrain from making that inquiry and determination.

The following chronology is appropriate to the understanding of the problem. The facts indicate that originally the Catholic churches in the Racine area were located in ethnic neighborhoods and that the parochial schools were established to furnish religious education to the children of parishioners who lived near the church.

As the result of social and economic changes, these ethnic communities were dispersed over a large area,

but students no longer living in the immediate neighborhood of the church and school continued to attend there. This resulted in substantial difficulties for the Holy Trinity [Catholic] School, the predecessor of the Community School, because its students were spread over wide areas of the school district. Other Catholic parochial schools faced the same problem, which was aggravated under the statute requiring non-overlapping attendance districts for schools affiliated with the same denomination.

The Holy Trinity School, together with other parochial schools, in 1971 brought an original action in this court to secure a declaration that the portion of sec. 121.51(4), Stats., which provides that attendance areas of private schools affiliated with the same religious denomination shall not overlap was unconstitutional. We held the statute to be constitutional after construing the statute to provide that the rule which prohibits overlapping was a general rule applicable to both secular and religious schools. We held that the effect of the statute was to prohibit overlapping attendance districts in respect to public schools, private nonreligious schools operated under the same system, and religious schools affiliated or operated by a single sponsoring group or denomination. In dicta, we stated that, although separate Catholic orders operated schools in a particular school district, they were to be considered along with the diocesan schools as part of the Catholic school system, because they were all affiliated with the same religious denomination. *State ex rel. Vanko v. Kahl,* 52 Wis.2d 206, 188 N.W.2d 460 (1971).

After the determination of the constitutionality of sec. 121.51(4), Stats., the Holy Trinity School was obliged, were it to remain a Catholic school, to be assigned a transportation attendance area which did not

comport with the geographic area whence it drew its students.

In the recitation of facts incorporated in the circuit judge's direction for judgment appears this statement, unquestioned on this appeal:

"To overcome the limitation of sec. 121.51(4), which forbids the overlapping of attendance areas for schools affiliated with the same religious denomination, Holy Trinity incorporated under chapter 181, Wis. Stats., as a non-denominational private school."

Accordingly, in December of 1971, the Holy Trinity School, which was admittedly a Roman Catholic school operated by the Holy Trinity Congregation, ceased to operate, and in its stead the Holy Trinity Community School was incorporated. This new school has no legal ties to the Roman Catholic church and its bylaws provide that the school shall have no affiliation with any religious denomination.

When the new school was incorporated, it took over the day-to-day operations of its predecessor. By assuming the existing teachers' contracts of the Catholic school, it agreed to employ, at least for the first semester, the same teachers, five of whom were nuns, who had been employed by the predecessor school. It also agreed to accept the students previously enrolled in the parish school. The building occupied by the newly incorporated school was the one previously used, and it continued to be owned by the Holy Trinity Congregation. The Congregation, however, leased the school building and all the facilities therein to the new Community School for a rental of one dollar per year.

The usual and formal Catholic religious instruction carried on in the predecessor school was discontinued, and the new Community School instituted a released-time program under which students could be released from their classes for one-half hour each day to attend re-

ligious instruction of their parents' choice. The released-time program was carried on within the school building under the tutelage of the Holy Trinity parish priest. He was not an employee of the school corporation. Other religions were invited to participate in the released-time program, but none has accepted that invitation, and the record shows that only the Catholic religion is taught in the released-time program. At the time of the school's petition in 1971, approximately 75 percent of the students attended the Catholic released-time instruction sessions. Eighty percent of the students then attending the school were children of members of the Holy Trinity Congregation.

In 1971, when the petition was submitted to the district school board, all of the faculty members were Catholic, and five of them were nuns, who taught garbed in their religious habits. The record makes clear, however, that the school operated independently of the diocesan school superintendent, and, in respect to the courses taught, there was no conformity to any hierarchically imposed Catholic curriculum.

On the basis of these facts, the Superintendent of Public Instruction found that this school was affiliated with the Catholic denomination and that it need not be controlled by the archdiocese in which it is located for it to be affiliated with the Roman Catholic Church. Relying on *Herman v. United Automobile, Aircraft & Agricultural Implement Workers of America,* 264 Wis. 562, 569, 59 N.W.2d 475 (1953), he asserts:

"The word 'affiliated' . . . literally means a close association . . . . When used with respect to organizations, the word means that two or more organizations are allied with or closely connected with one another, or with a central body."

Using this definition and relying on the facts recited above, the Superintendent of Public Instruction contends

that the mere separation of the school, as a legal entity, from the Catholic Church, of which it was previously a part, is insufficient to show that it is no longer affiliated with that denomination. In short, the Superintendent would have us pierce the corporate veil to look at the facts and, from those facts, determine that, despite the protestation of the corporation, it nevertheless is Roman Catholic and is affiliated with that denomination.

Were the school claiming to be a public school supported by public taxes and were the facts found as set forth above, we would, on the basis of well established precedent, conclude that public funds were being unconstitutionally used for sectarian or religious purposes.[3] Here, however, the claim of the petitioner is not that it is a public school and entitled to public funding, but that it is a private school—albeit of a religious nature—asking for only such financial support from the state

---

[3] *Knowlton v. Baumhover*, 182 Iowa 691, 166 N.W. 202 (1918); *Harfst v. Hoegen*, 349 Mo. 808, 163 S.W.2d 609 (1942); *Berghorn v. Reorganized School District No. 8*, 364 Mo. 121, 260 S.W.2d 573 (1953); *State ex rel. Public School District No. 6 v. Taylor*, 122 Neb. 454, 240 N.W. 573 (1932). These cases involve schools, ostensibly public, and supported by public funds, which were in fact being operated as sectarian institutions. Under such circumstances, the civil court is obligated to examine the actual practices of the school in detail because of the constitutional prohibition against establishment of religion. If the "public" school is in fact a sectarian school, then it is unconstitutional to use tax funds for its support. The inquiry is constitutionally required in order to prevent an independent constitutional violation. In the present case, however, there is no analogous constitutional justification for scrutiny of the practices of the school, because it would be constitutionally permissible to provide publicly funded transportation to the students even were the school concededly sectarian. Therefore, the "excessive entanglement" problem becomes paramount under the facts of this case, and we are required to give effect to the strong constitutional interest in prohibiting the continuing surveillance which would be necessary to determine whether or not the school is affiliated with a particular religious denomination.

for student transportation as would be afforded to any other private religious institution. The state, by the Superintendent of Public Instruction, is, in effect, insisting that it, on the basis of inspection and surveillance of the school, may determine the denominational allegiance of the institution.

We have previously alluded to the fact that the hearing of this appeal has been delayed for several years by the inexplicable failure to file the record. Accordingly, the facts set forth above have substantially changed. At oral argument it was conceded that no nuns now teach in the school and that over 50 percent of the students are unrelated to members of the Holy Trinity Congregation.

The incorporators of the Community School point out that the state seeks to judge the nature of the school and its affiliation on the state of the record as the facts appeared seven years ago at the time of the initial transition to the school's independent status. The petitioners claim that those facts had only temporary relevance, because they were obliged to carry out the contracts of the predecessor school. Counsel for the Superintendent of Public Instruction stated at oral argument that, if such were the case, a new application for an attendance area could be submitted on the basis of the changed facts and a new determination could be made.

It is apparent, then, that the Superintendent of Public Instruction in administering sec. 121.51(4), Stats., envisages his duty as necessitating continued examination and surveillance of the religious composition of both the instructional staff and the students of the Community School. The Superintendent of Public Instruction conceives it to be his obligation to monitor religious schools to determine to what denomination they owe allegiance and with what denomination they are affiliated.

Under the facts peculiar to this case, the attempt of the Superintendent of Public Instruction to administer

the law results in excessive entanglement of state authority in religious affairs. For this court or for the Superintendent of Public Instruction to determine, in the light of the *prima facie* showing of the articles of incorporation to the contrary, that this school corporation is or is not affiliated with the Catholic denomination is to meddle into what is forbidden by the Constitution—the determination of matters of faith and religious allegiance.

Under the First and Fourteenth Amendments to the Constitution, state authorities may make no laws respecting the establishment of religion or prohibiting the free exercise thereof. It is from these constitutional provisions that the entanglement doctrine sprang.

The entanglement doctrine developed by the United States Supreme Court as an aspect of religious freedom is explained in an article by James L. Underwood, *Permissible Entanglement under the Establishment Clause,* 25 Emory L. J. 17, 17–8. That article states:

"First, the doctrine dictates that governmental programs must not have the purpose or effect of advancing or inhibiting religion. Second, it prohibits excessive intermixture of government and religion in the shape of intensive governmental control and surveillance of the activities of religious organizations. Third, it disallows comparable interference by religion with the workings of government. The doctrine has been described by Professor Freund as one demanding 'mutual abstention' by church and governmental officials from interference with each other's domain."

The Superintendent of Public Instruction would have us ratify what he conceives to be his duty—the continuing surveillance of this school to determine whether its practices comport with those of the Catholic Church. He would have us say that he can properly make the determination of who or what is Catholic. This is an in-

quiry that government cannot make, and the prohibition against such an inquiry, as has been said by Leo Pfeffer, *Church, State, and Freedom* 302:

". . . is the price that must be paid for separation; yet careful consideration should lead to the conclusion that, aside from the requirements of the First Amendment, this result is far preferable to the conversion of secular courts into ecclesiastical tribunals in which, for example, Protestant, Jewish, or even atheistic judges might overrule a cardinal's, or, conceivably, even a Pope's interpretation of Catholic dogma."

The above quotation, of course, has principal reference to the unconstitutionality of secular tribunals over-ruling a determination of an ecclesiastical tribunal in matters of faith—the general theory being that secular judges do not have competence in the field, and, more importantly, that it is beyond the constitutional jurisdiction of a secular court to determine matters of faith or dogma. The quotation is, however, equally appropriate in a situation such as the one presently before the court, where the Superintendent of Public Instruction would attempt to have us determine on the basis of his findings that Community School practices in reference to religion are exclusively referable to "affiliation" with the Catholic denomination.

There is, of course, no excessive entanglement of the state with religion in the mere granting of transportation aids. This is a secular purpose which, in itself, is legally deemed to be unrelated to fostering or inhibiting religion. But when the method of administering this aid requires a state imposed classification dependent upon religious allegiance or affiliation, and the administrator of the program concludes that surveillance of the institution receiving the aid is necessary to determine the na-

ture of the school's religious program, the entanglement of the state in matters of religion becomes excessive.

This principle was recently well expressed in *New York v. Cathedral Academy,* — U.S. —, 98 S Ct. 340, 54 L. Ed.2d 346 (December 6, 1977). In that case, the New York state legislature authorized the reimbursement to sectarian schools for the expenses of performing state-required testing services. However, reimbursement was to be made only after a detailed inquiry which would show that the reimbursement was used only for secular purposes. The court said, in holding such procedures unconstitutional:

". . . that this sort of detailed inquiry into the subtle implications of in-class examinations and other teaching activities would itself constitute a significant encroachment on the protections of the First and Fourteenth Amendments. In order to prove their claims for reimbursement, sectarian schools would be placed in the position of trying to disprove any religious content in various classroom materials. In order to fulfill its duty to resist any possibly unconstitutional payment, see n. 2, *supra,* the State as defendant would have to undertake a search for religious meaning in every classroom examination offered in support of a claim. And to decide the case, the Court of Claims would be cast in the role of arbiter of the essentially religious dispute.

"The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment, and it cannot be dismissed by saying it will happen only once. Cf. *Presbyterian Church v. Mary Elizabeth Blue Hill Memorial Presbyterian Church,* 393 U.S. 440. When it is considered that ch. 996 contemplates claims by approximately 2,000 schools in amounts totalling over $11 million dollars, the constitutional violation is clear.

"For the reasons stated, we hold that ch. 996 is unconstitutional because it will of necessity either have the primary effect of aiding religion, see *Levitt v. Committee for Public Education, supra,* or will result in excessive

state involvement in religious affairs. See *Lemon v. Kurtzman*, 403 U.S. 602." (Slip opinion at 7–8)

We would conclude that the detailed inquiry which the State Superintendent of Public Instruction has made is equally repugnant to the Constitution. By avoiding the making of that inquiry and by accepting the Holy Trinity Community School on the basis of its articles of incorporation as what it purports to be—a school independent of any denomination—the unconstitutionality in the administration of the statute can be avoided.

We believe that the language and rationale of a rather old case, *Bradfield v. Roberts*, 175 U.S. 291 (1899), is applicable here. The Supreme Court in that case was concerned with a congressional appropriation to hospitals in the District of Columbia. The court upheld the appropriation against a challenge that it constituted a violation of the establishment clause.

Although the question in *Bradfield* was whether or not the hospitals were used for religious purposes—an issue not relevant to the instant case—the case is instructive in that the court did not attempt to pierce the corporate veil and instead looked only to the articles of incorporation. The court stated:

"Assuming that the hospital is a private eleemosynary corporation, the fact that its members, according to the belief of the complainant, are members of a monastic order or sisterhood of the Roman Catholic Church, and the further fact that the hospital is conducted under the auspices of said church, are wholly immaterial, as is also the allegation regarding the title to its property. . . . Whether the individuals who compose the corporation under its charter happen to be all Roman Catholics, or all Methodists, or Presbyterians, or Unitarians, or members of any other religious organization, or of no organization at all, is of not the slightest consequence with reference to the law of its incorporation, nor can

the individual beliefs upon religious matters of the various incorporators be inquired into. Nor is it material that the hospital may be conducted under the auspices of the Roman Catholic Church. . . . That the influence of any particular church may be powerful over the members of a non-sectarian and secular corporation, incorporated for a certain defined purpose and with clearly stated powers, is surely not sufficient to convert such a corporation into a religious or sectarian body. . . . There is no allegation that its hospital work is confined to members of that church . . . ." (at 297–98)

While we reach no conclusion that the Court would follow the same approach at the present time, it is interesting to note that a similar rationale was followed in *Hunt v. McNair*, 413 U.S. 734 (1973).

For our purposes, it is sufficient to be apprised of the teaching of *Bradfield* that, at least in institutions concerned with the general welfare and where there is no claim, in respect to a school, that it is a public school, facial validity will be accorded to the expressed intentions of the incorporators in the corporate charter. We accord the same facial validity to the charter and bylaws of the Holy Trinity Community School. It purports to be a school fostering religion generally, but expressly disavows affiliation with any church denomination. We believe that, to inquire further, impinges on the religious right of citizens to make their own declaration in respect to their religious affiliation.

Under the constitution and laws of the State of Wisconsin, religious schools may receive transportation aids; and whether or not it could be concluded that Holy Trinity Community School is indeed affiliated with the Catholic denomination, the payment of transportation aids is not unconstitutional. However, to make the inquiry and to determine that the school is or is not affiliated with the Catholic denomination is to make an impermis-

sible inquisition into religious matters. We are obliged to accept the professions of the school and to accord them validity without further inquiry.

Under the facts of this case, we hold that the Holy Trinity Community School is a private school, independent of any religious denomination; and, accordingly, as a matter of law is entitled to a district-wide attendance area.

On oral argument, counsel for the Superintendent of Public Instruction argued that, if no inquiry were made beyond the facial representations of the corporate charter, other church-related schools might very well adopt the device used by the Community School—that is, to set up an independent corporation while in fact retaining their affiliation with a religious denomination. It was asserted that this might be done to make possible a larger attendance area and that this would insure the perpetuation of a parochial school that might otherwise be unable to survive.

It should be noted that, even though the usual rule is to give finality to the rulings of ecclesiastical adjudicatory bodies, the courts reserve the right to look behind such decisions where there is evidence of fraud or collusion. *E.g., Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U.S. 1 (1929).

Although the Attorney General's fears are by no means preposterous, fraud is not alleged in the present case. Counsel for the Superintendent specifically disclaimed that there was any fraud in respect to the claim of the Community School. Fraud must be proved by clear and convincing evidence; and were fraud alleged and proved, we would look behind a representation which on its face purported to demonstrate a complete lack of denominational affiliation.

The very fact that the Attorney General argues that the statutory prohibition against the overlapping of at-

tendance districts of schools affiliated with the same denomination may encourage religious disaffiliation raises yet another specter of unconstitutionality, albeit a specter that does not materialize under the facts of the instant case. If it can be said that sec. 121.51(4), Stats., encourages parochial schools to disaffiliate from their former parent denomination in order to secure additional state transportation aids, does not the operation of that statute inhibit the free exercise of religion?

Justice John Stevens of the United States Supreme Court alluded to that possibility in his brief dissent to *Roemer v. Maryland Public Works Board,* 426 U.S. 736, 775 (1976), when he wrote:

". . . I would add emphasis to the pernicious tendency of a state subsidy to tempt religious schools to compromise their religious mission without wholly abandoning it. The disease of entanglement may infect a law discouraging wholesome religious activity as well as a law encouraging the propagation of a given faith."

A similar concern was expressed in the Emory Law Journal, *supra,* at 35–6, when the author of the article stated he thought it appropriate to focus upon the psychology of the officials of religious schools who seek to participate in the largesse afforded by governmental aids to education. He wrote:

"The mere existence of inspection powers designed to root out any religious usage . . . could divert the long-range planning of an institution from its religious goals. Consequently, an assistance program might have the primary effects of inhibiting religion and violating Establishment Clause standards. Such a diversion of religiously affiliated institutions away from religious goals was historically a concern of proponents of religious freedom. For example, the Hanover Presbytery, in its notable series of correspondence to the Virginia Assembly, asserted that state 'support would render preachers accountable to the state, not to Christ.'

"Seeking to qualify for state aid could produce a significant alteration in institutional goals. Justice Brennan, dissenting in *Hunt*, asserted that

" '[t]he College's freedom to engage in religious activities and to offer religious instruction is necessarily circumscribed by this pervasive state involvement forced upon the College if it is not to lose its benefits under the Act.' "

That issue, the effect of the statute possibly being to discourage religion, is only adumbrated under the facts of this case. As pointed out, however, earlier in the opinion, the trial judge in his decision stated that the Community School disaffiliated from its former relationship with the Catholic Church in order to overcome the limitations placed upon it by the statute, which prohibits overlapping attendance districts by schools of the same denomination. There looms on the horizon, therefore, another constitutional question in regard to the student transportation act. Rather than being of assistance only to the children who attend a religious school, does it not in fact encourage religious schools, in order to survive, to disavow their religious beliefs and associations? The question is neither posed nor argued by the parties, and we do not comment on it further.

As stated in the recital of the facts, this case comes to the court in an unusual posture. The avowed disaffiliation of a parochial school from its parent hierarchical body is unique in Wisconsin legal history. In the usual case, religious affiliation is acknowledged and uncontested.

In respect to the case before us, we hold only, where a religious school demonstrates by a corporate charter and bylaws that it is independent of, and unaffiliated with, a religious denomination, that in the absence of

fraud or collusion the inquiry stops there. To make the further inquiry, as attempted by the Superintendent of Public Instruction, is to involve the state in religious affairs and to make it the adjudicator of faith. To so proceed results in the excessive entanglement of the secular state with religious institutions and is forbidden by the Constitution of the United States.

*By the Court.*—Judgment reversed and cause remanded, with directions to enter judgment ordering the Superintendent of Public Instruction to designate an attendance area co-extensive with the school district.

CALLOW, J., took no part.