ST. AUGUSTINE SCHOOL and Joseph
and Amy Farro, Plaintiffs,

v.

Tony EVERS, in his official capacity as
Superintendent of Public Instruction,
and Friess Lake School District, De-
fendants.

Case No. 16–C–0575

United States District Court,
E.D. Wisconsin.

Signed June 6, 2017

Brian W. McGrath, Charles J. Szafir, Richard M. Esenberg, Wisconsin Institute for Law & Liberty, Inc., Milwaukee, WI, for Plaintiffs.

Kristin Renee Pierre, Sara K. Beachy, Lori M. Lubinsky, Axley Brynelson, LLP, Laura M. Varriale, Wisconsin Department of Public Instruction, Madison, WI, for Defendants.

## DECISION AND ORDER

LYNN ADELMAN, United States District Judge

## I. BACKGROUND

Wisconsin law requires the school board of a school district to provide each student residing in the district with transportation to and from his or her school if the student resides two miles or more from the school. Wis. Stat. § 121.54(2). The school board must provide transportation even to students who attend a private school (including a religious private school), but only "if such private school is a school within whose attendance area the pupil resides" and the school is located either within the school district or within five miles of the district's boundaries *Id.* § 121.54(2)(b)1. The "attendance area" is the geographic area designated by the private school as the area from which it draws its students, but the school board of the district must also approve the attendance area. *Id.* § 121.51(1). If the private school and the

school board cannot agree on the attendance area, the state superintendent of public instruction must, upon the request of the private school and the school board, make a final determination of the attendance area. *Id.* As is relevant to this case, the law provides that "[t]he attendance areas of private schools affiliated with the same religious denomination shall not overlap." *Id.*

Joseph and Amy Forro send their three children to St. Augustine School, which is a private religious school. The Forros live within the Friess Lake School District and more than two miles from St. Augustine. St. Augustine is located within five miles of the Friess Lake School District's boundaries. In March 2015, to enable the Forros to receive transportation aid as provided by Wisconsin law, a representative from St. Augustine called the district and requested that it approve the school's attendance area under Wis. Stat. § 121.51(1). The district and the school then exchanged a number of communications. Throughout these communications, the district maintained that it could not approve St. Augustine's attendance area because that area overlapped with the attendance area of St. Gabriel, a private school in the district for which the district already provided transportation and that was affiliated with the same religious denomination as St. Augustine, which the district described as "Roman Catholic." *See, e.g.,* Decl. of Tim Zignego Ex. G.

St. Gabriel is a Roman Catholic school that is affiliated with the Archdiocese of Milwaukee. Although St. Augustine is a Roman Catholic school, it is not affiliated with the Archdiocese. Moreover, the school appears to have at least slightly different religious beliefs, and to follow at least slightly different religious practices, than would a school that is affiliated with the Archdiocese. St. Augustine has not in its briefs and affidavits extensively described how it differs from a diocesan school, but it states that it believes that it "operates more fully within the Catholic tradition than Archdiocesan schools" and that it is "religiously distinct from schools operated by the Archdiocese." Zignego Decl. ¶ 10. From my review of the excerpts from St. Augustine's website that appear in the record, I have drawn the conclusion that St. Augustine is what might be described as "Traditionalist Catholic," which is a branch of Catholicism whose members believe that there should be a restoration of many or all of the customs, traditions, and practices of the Roman Catholic Church before the Second Vatican Council. *See* https://en. wikipedia.org/wiki/Traditionalist_Catholic (last viewed June 6, 2017). For example, St. Augustine states on its website that it follows certain traditional Catholic practices, such as the reception of communion directly on the tongue while kneeling and the celebration of Mass in Latin. ECF No. 33–6 at p. 5 of 10. These are generally considered "traditionalist" practices that the Roman Catholic Church does not necessarily follow today. However, my conclusion that St. Augustine is Traditionalist Catholic may not be accurate, and my analysis of the legal issues in this case do not depend on this conclusion. I mention the possibility that St. Augustine is Traditionalist Catholic only to provide some background information about how St. Augustine differs from a diocesan school.

After the Friess Lake School District initially denied St. Augustine's proposed attendance area, St. Augustine asked it to reconsider its decision, pointing out that St. Gabriel is a Roman Catholic school affiliated with the Archdiocese of Milwaukee, while St. Augustine is independent of the Archdiocese. *See, e.g., id.* Ex. D. St. Augustine might also have attempted to explain to the district that it practices Catholicism differently than diocesan schools, but no such communication ap-

pears in the record. However, the administrator of the district wrote in a letter to the school that the school's "belief that there is a distinction between St. Augustine and St. Gabriel's regarding adherence to Catholic principles is your fight, not ours." Zignego Decl. Ex. F. This statement implies that St. Augustine said something to the administrator about its practicing Catholicism differently than St. Gabriel. In any event, the district continued to refuse to approve St. Augustine's attendance area because it overlapped with St. Gabriel's attendance area, and because both schools called themselves Catholic schools.

Because St. Augustine and the district could not agree on an attendance area, they submitted their dispute to the state superintendent of public instruction for a final determination under Wis. Stat. § 121.51(1). In its letter to the superintendent, St. Augustine argued, as it did to the district, that its attendance area could overlap with St. Gabriel's because St. Gabriel was a Roman Catholic school affiliated with the Archdiocese of Milwaukee, while St. Augustine was independent of the Archdiocese. *See* Aff. of Laura M. Varriale Ex. D. St. Augustine argued, in part, as follows:

St. Augustine School, Inc., is a Wisconsin non-stock corporation, incorporated in 1981 as Neosho Country Christian School, Inc. The name was changed in 1994 to the current name. Neither St. Augustine School, Inc., nor the school operated by the corporation, has ever been affiliated by control, membership, or funding with the Archdiocese of Mil-

waukee. No representative of the Archdiocese or a parish church of the Archdiocese has ever been a director or officer of St. Augustine School, Inc. No employees of St. Augustine School have ever been hired or compensated by the Archdiocese or a parish church of the Archdiocese. None of the religious instructors at St. Augustine School have ever been employed, assigned, or compensated for their work at St. Augustine School by the Archdiocese or a parish church of the Archdiocese. Students currently enrolled at St. Augustine school come from families who are members of five different churches, including some churches independent of the Archdiocese of Milwaukee.

*Id.*

St. Augustine provided the superintendent with a copy of its bylaws, and also an amendment to its articles of incorporation showing that it was previously known as Neosho Country Christian School, Inc. *Id.* Although St. Augustine seems to have intended to also provide the superintendent with a copy of the school's full articles of incorporation, *see* Pls. Resp. to Defs. Prop. Finding of Fact ¶ 22, the superintendent claims that it never received a copy, *see* Varriale Aff. ¶ 14. The Friess Lake School District also denies ever receiving a copy of the articles of incorporation. Decl. of Denise Howe ¶ 15. The plaintiffs admit that neither the superintendent nor the district saw St. Augustine's articles of incorporation. Pls. Resp. to Defs. Prop. Finding of Fact ¶ 22.[1] The articles of incor-

---

1. Technically, the plaintiffs admit only that the defendants did not "consider" the articles of incorporation. Pls. Resp. to Defs. Prop. Finding of Fact ¶ 22. This is not necessarily the same thing as admitting that the defendants did not "see" the articles of incorporation. That is, the defendants might have seen the articles of incorporation and made a conscious decision not to consider them.

However, from the context of the plaintiffs' response, I conclude that the plaintiffs do not contend that the defendants saw the articles and intentionally disregarded them. Rather, they seem to admit that, due to an inadvertent error, the articles of incorporation never made their way to the relevant decisionmakers at the district and the department of public instruction. *See id.*

poration describe Neosho Country Christian School as "an interdenominational Christian school." Zignego Decl. Ex. A, art. III. However, the bylaws and amendment to the articles of incorporation do not contain any similar statement or otherwise indicate whether St. Augustine is affiliated with a religious denomination.

In its submission to the superintendent, the school district argued that St. Augustine and St. Gabriel could not have overlapping attendance areas because they both described themselves as Catholic schools and therefore were, for purposes of § 121.51(1), "affiliated with the same religious denomination," even if they were each "incorporated under a different charter." Varriale Aff. Ex. F. The district provided the superintendent with print-outs from St. Augustine's website, which describe the school as "an independent and private traditional Roman Catholic School." Id. at p. 2 of 4.

On March 10, 2016, the superintendent, through his designee, issued a written decision on the dispute over St. Augustine's attendance area. Varriale Aff. Ex. G. The superintendent began by citing Wis. Stat. § 121.51(1), emphasizing the language stating that "[t]he attendance areas of private schools affiliated with the same religious denomination shall not overlap." Id. at 4. He then described the parties' arguments as follows:

> The District contends both [St. Augustine] and St. Gabriel's are affiliated with the Roman Catholic denomination and that their attendance areas overlap. [St. Augustine] argues the District may not look beyond the School's corporate status, its name change amendment, and its bylaws to reach the District's conclusion that the School is a religious school affiliated with the Roman Catholic denomination. To do otherwise, the School contends, results in a constitutionally

impermissible entanglement of state authority in religious affairs.

Id. at 4–5. After discussing relevant legal authority, the superintendent noted that St. Augustine's bylaws and the amendment to its articles of incorporation revealed nothing about its religious affiliations. (Again, it is undisputed that the superintendent did not see the articles of incorporation describing St. Augustine, under its old name, as an "interdenominational Christian school.") The superintendent reasoned that because St. Augustine had submitted no organizational documents that disclosed its religious affiliations, he could consider the print-outs from St. Augustine's website—in which it described itself as a "traditional Roman Catholic School"—without excessively entangling himself in a religious matter. Id. at 6–7. Based on the print-outs, the superintendent concluded that St. Augustine was "a religious school affiliated with the Roman Catholic denomination" for purposes of § 121.51(1). Id. at 7. The superintendent thus agreed with the school district's determination that St. Augustine and St. Gabriel could not have overlapping attendance areas. Id. at 7–8.

Because neither the school district nor the superintendent approved St. Augustine's attendance area, the Forros did not receive state transportation aid during either the 2015–16 school year or the 2016–17 school year. The parties agree that, had the Friess Lake School District provided this aid to the Forros, the cost to the district would have been $1,500 per school year. Defs. Resp. to Pls. Prop. Finding of Fact ¶ 28.

In April 2016, the Forros and St. Augustine commenced this action in state court against the Friess Lake School District and the state superintendent of public instruction. The defendants removed the action to this court. The plaintiffs allege that

the district's and the superintendent's decisions to deny it an overlapping attendance area with St. Gabriel were erroneous applications of Wis. Stat. § 121.51(1) and also violated the Religion Clauses of the United States Constitution (that is, the Free Exercise and Establishment Clauses of the First Amendment) and the Equal Protection Clause. The plaintiffs seek relief against the district and the superintendent under 42 U.S.C. § 1983 and state law.

The superintendent has filed a motion to be dismissed from this case on various grounds, and the superintendent and the district have filed a joint motion for summary judgment. The plaintiffs have filed their own motion for summary judgment. For relief, the plaintiffs seek: (1) a judicial finding (either in the form of a declaratory judgment or judicial review of the superintendent's administrative decision under state law) that the superintendent's decision to reject St. Augustine's proposed attendance area was erroneous as a matter of state law; (2) a declaratory judgment against both the district and the superintendent stating that the defendants violated the plaintiffs' federal constitutional rights; (3) an injunction against the district and the superintendent preventing them from denying transportation aid to the Forro children to attend St. Augustine; (4) damages against Friess Lake School District in the amount of $1,500 for each of the two school years in which the Forros were already denied transportation aid; and (5) costs and attorneys' fees under 42 U.S.C. § 1988.

## II. DISCUSSION

The motions under consideration are the superintendent's motion to dismiss the complaint against it, and the parties' cross-motions for summary judgment. However, I discuss only the parties' motions for summary judgment because they are dispositive. Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Before proceeding further, I note that the central issue in this case is one of state law: did the school district and the superintendent properly interpret and apply the definition of "attendance area" that appears in Wis. Stat. § 121.51(1)? This issue arises in the form of the plaintiffs' request for judicial review of the superintendent's final decision to deny St. Augustine its proposed attendance area under Wis. Stat. § 121.51(1). *See* Compl. ¶¶ 71–73. I may exercise jurisdiction over this state-law claim pursuant to the supplemental-jurisdiction statute because that claim is part of the "same case or controversy" as the plaintiffs' claim for violation of their rights under the Constitution. *See* 28 U.S.C. § 1367(a). However, the supplemental-jurisdiction statute provides that a district court may decline to exercise supplemental jurisdiction over a state-law claim if it "raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). As explained in more detail below, the plaintiffs' state-law claim does raise a novel issue of state law, in that the existing Wisconsin cases do not clearly answer the question of whether the defendants correctly implemented the attendance-area definition of § 121.51(1). Thus, I will relinquish supplemental jurisdiction over the plaintiffs' claim for judicial review of the superintendent's decision and remand that claim to state court. Still, I must decide the plaintiffs' federal claim, which they bring under 42 U.S.C. § 1983. But, as will be made clear in the discussion that follows, this federal claim is closely

related to the plaintiffs' state-law claim. For this reason, I will begin by discussing the relevant state cases, which are *State ex rel. Vanko v. Kahl*, 52 Wis. 2d 206, 188 N.W.2d 460 (1971) and *Holy Trinity Community School, Inc. v. Kahl*, 82 Wis. 2d 139, 262 N.W.2d 210 (1978).

In *Vanko*, several individuals and private religious schools in Racine County alleged that the "same religious denomination" sentence in § 121.51(1)'s definition of "attendance area" was unconstitutional.[2] The plaintiffs argued that because this prohibition against overlapping attendance areas applied only to affiliated religious schools, and not also to private nonreligious schools that were affiliated with each other, the law discriminated against religious schools in violation of the First Amendment. *Id.* at 213–14, 188 N.W.2d 460. The Wisconsin Supreme Court allowed that, if the statute indeed meant that only affiliated religious schools were prohibited from having overlapping attendance areas, then the statute would present "an apparent constitutional infirmity." *Id.* at 214, 188 N.W.2d 460. However, the court determined that the statute did not mean that only affiliated religious schools were prohibited from having overlapping attendance areas. Instead, the court determined, the statute prohibited "overlapping in attendance area boundary lines as to *all* private schools affiliated or operated by a single sponsoring group, whether such school operating agency or corporation is secular or religious." *Id.* at 215, 188 N.W.2d 460 (emphasis in original). The court found that this more general restriction against overlapping was "inherent in the whole concept of 'attendance areas.'" *Id.* Thus, reasoned the court, the statute treated religious and nonreligious private schools the same and did not present a constitutional problem.

The *Vanko* court recognized that its interpretation of the statute seemed to reduce the "same religious denomination" sentence in § 121.51 to "mere surplusage." *Id.* However, the court determined that this sentence still added something to the statute, which was "to make 'affiliated with the same religious denomination' the test of affiliation in a single school system rather than operation by a single agency or set of trustees or religious order within a particular religious denomination." *Id.* The court gave the following example:

> [The sentence] means that, if the Franciscan Order of the Roman Catholic church operates a school in the northern part of the Racine district, and the Jesuit Order operates a school in the southern part of the district, they are to be considered, along with diocesan schools, as part of the Catholic school system of Racine because all are "affiliated with the same religious denomination."

*Id.* at 215–16. In this part of its opinion, the court concluded that the statute defines a religious denomination as the "sponsoring group" for purposes of determining the attendance areas of religious schools. In other words, all schools affiliated with the same religious denomination are affiliated with the same sponsoring group.

In the second Wisconsin Supreme Court case at issue, *Holy Trinity Community School*, the court considered the method by which state officials could determine whether a private school is affiliated with a particular religious denomination. That case involved the Holy Trinity School, which was one of the plaintiffs in *Vanko*. Before *Vanko* was decided, the Holy Trinity School was known as the Holy Trinity Catholic School and was a parochial school affiliated with the Roman Catholic

---

**2.** At the time *Vanko* was decided, the attendance-area definition was codified at Wis. Stat. § 121.51(4). 52 Wis.2d at 208–09, 188 N.W.2d 460.

Church. *Holy Trinity*, 82 Wis.2d at 145–46, 262 N.W.2d 210. The school's students were spread over a wide area of the Racine school district, and after *Vanko* upheld the prohibition against overlapping attendance areas, the Holy Trinity School stood to lose a large number of students to the Catholic schools that were closer to their homes. *Id.* at 145, 262 N.W.2d 210. To avoid this problem, the Holy Trinity Catholic School ceased operations and immediately reincorporated and reopened as the Holy Trinity Community School. *Id.* at 146, 262 N.W.2d 210. The reincorporated school had "no legal ties to the Roman Catholic church" and its bylaws provided that "the school shall have no affiliation with any religious denomination." *Id.* In making these changes to its organizational structure and bylaws, the school hoped to disaffiliate from the Catholic denomination and be entitled to its own attendance area, which could overlap with any of the other Catholic schools in the Racine district. However, when the school applied for its own attendance area, the state superintendent found that the school was still "affiliated" with the Roman Catholic denomination. *Id.* at 147, 262 N.W.2d 210. The superintendent made this finding by looking behind the school's organizational documents—which stated that the school was "independent of any denomination," *id.* at 153, 262 N.W.2d 210—and examining various practices of the school—such as its hiring nuns and adopting a "released time" program through which 75% of the school's students received Roman Catholic religious instruction—that suggested it was still a Roman Catholic school. *Id.* at 146–49, 262 N.W.2d 210.

The state supreme court found that the superintendent's determining the "denominational allegiance" of the school though "inspection and surveillance of the school" resulted in "excessive entanglement of state authority in religious affairs." *Id.* at 149–50, 262 N.W.2d 210. The court held

that the superintendent should have taken at face value the language in the school's articles of incorporation and bylaws that disclaimed affiliation with any religious denomination. *Id.* at 149–55, 262 N.W.2d 210. The court stated that "[b]y avoiding the making of [the superintendent's detailed inquiry] and by accepting the Holy Trinity Community School on the basis of its articles of incorporation as what it purports to be—a school independent of any denomination—the unconstitutionality in the administration of the statute can be avoided." *Id.* at 153, 262 N.W.2d 210. The court summarized its holding as follows:

> In respect to the case before us, we hold only, where a religious school demonstrates by a corporate charter and bylaws that it is independent of, and unaffiliated with, a religious denomination, that in absence of fraud or collusion the inquiry stops there. To make further inquiry, as attempted by the Superintendent of Public Instruction, is to involve the state in religious affairs and to make it the adjudicator of faith. To so proceed results in the excessive entanglement of the secular state with religious institutions and is forbidden by the Constitution of the United States.

*Id.* at 157–58, 262 N.W.2d 210.

The plaintiffs interpret *Vanko* and *Holy Trinity* to mean that, in approving private-school attendance areas, "[s]chool districts and the Superintendent must ignore the question of 'religious denomination' and focus on the question of legal affiliation." Pl. Br. at 11, ECF No. 23. The plaintiffs further argue that, under these cases, the state authorities, in determining affiliation, "must limit their review of the factors that may constitute 'affiliation' to those that are purely legal and secular—i.e., a review of the applicable constituent documents such as the articles of incorporation and by-laws of the school." *Id.* The plaintiffs contend

that "[i]f those documents do not demonstrate an affiliation, the State's inquiry must end." *Id.*

The plaintiffs' interpretation of *Vanko* and *Holy Trinity* is not entirely accurate. First, these cases do not establish that state decisionmakers must entirely ignore a school's religious denomination when approving an attendance area under § 121.51(1). Although the court in *Vanko* interpreted the statute to prohibit overlapping attendance areas for private schools "affiliated or operated by a single sponsoring group," the court further determined that, with respect to religious private schools, "sponsoring group" means the religious denomination with which the school is affiliated. 52 Wis. 2d at 215–16, 188 N.W.2d 460 (stating that relevant sentence of § 121.51(1) makes "affiliated with the same religious denomination" the "test of affiliation" for religious private schools).[3] Thus, under *Vanko*, state decisionmakers must still determine whether the "group" that "sponsors" the private school is religious, and, if it is, whether it is "affiliated" with a "denomination" that already operates a school with an overlapping attendance area.

Second, *Vanko* does not hold that every private school is necessarily entitled to an attendance area that overlaps with any other private school so long as both schools are organized as legal entities that are not affiliated with each other in the corporate-law sense. Rather, the test that the court adopted in *Vanko* was that schools "affiliated or operated by a single sponsoring group" cannot have overlapping attendance areas. *Id.* at 215, 188 N.W.2d 460. The court did not precisely define what constitutes a "single sponsoring group." Instead, it left the term undefined and only vaguely described it as meaning things like "a school operating agency or corporation" or a "religious denomination." *Id.* at 215–16, 188 N.W.2d 460. Certainly *Vanko* does not hold that every independent legal entity is its own "sponsoring group." It is possible that, in using the term "sponsoring group," the court had in mind a broader meaning that would include a collection of legal entities that are all united by some underlying similarity, even if they are not all "affiliated" in the corporate-law sense. For example, all schools that are members of the American Montessori Society,[4] but that are organized as independent, unaffiliated corporations, might qualify as schools "affiliated or operated by a single sponsoring group." *Vanko*, 52 Wis. 2d at 215, 188 N.W.2d 460. Thus, *Vanko* does not estab-

3. The plaintiffs contend that this part of *Vanko* is dicta. Reply Br. at 4. And indeed it is dicta in the sense that the *Vanko* case did not require the court to apply the "same religious denomination" sentence to the facts of the case before it. But this part of the opinion represents a key part of the court's reasoning for interpreting the statute to prohibit overlapping attendance areas for both religious and nonreligious private schools, in that the court was demonstrating that its interpretation of the statute did not reduce the sentence to mere surplusage. In any event, even if this part of the opinion is dicta and nonbinding, the important point is that no binding part of the opinion states or implies that state decisionmakers must "ignore the question of religious denomination" when determining the

affiliation of a religious private school. Pl. Br. at 11.

4. Montessori is an educational approach "characterized by an emphasis on independence, freedom within limits, and respect for a child's natural psychological, physical, and social development." https://en.wikipedia.org/wiki/Montessori_education (viewed June 6, 2017). The American Montessori Society advocates for the Montessori method in public and private schools throughout the United States, and publishes its own standards and criteria for its accredited member schools. https://en.wikipedia.org/wiki/American_Montessori_Society (last viewed June 6, 2017).

lish that a private school is necessarily entitled to an overlapping attendance area with any other private school with which it is not legally affiliated.

Third, *Holy Trinity* does not hold that if a private school's constituent documents, such as its articles of incorporation and bylaws, do not demonstrate an affiliation with a religious denomination, then the state decisionmakers cannot look further to determine whether the school is affiliated with that denomination. What *Holy Trinity* holds is that if the constituent documents *affirmatively demonstrate* that the school is *not* affiliated with a particular denomination, then the decisionmakers are bound by the documents and cannot, based on their own investigation, conclude that the relevant statements in the documents are false. *See, e.g.,* 82 Wis. 2d at 144, 262 N.W.2d 210 (noting that bylaws specifically disavowed affiliation with any religious denomination), 146 (same), 150 (noting that school's organizational documents made prima facie showing that school was not affiliated with a religious denomination), 157–58 (holding that "where a religious school demonstrates by a corporate charter and bylaws that it is independent of, and unaffiliated with, a religious denomination," the inquiry stops there). The case does not contain any discussion of what the decisionmakers can or cannot do where, as here, the constituent documents submitted to the decisionmakers do not indicate one way or the other whether the school is affiliated with a religious denomination, yet it is clear that the school is a religious school.

To be sure, *Holy Trinity* implies that under no circumstances could the state decisionmakers conduct their own extensive inquiry into the school's religious beliefs and practices and determine that it is

affiliated with a particular religious denomination. *Id.* at 149–50, 262 N.W.2d 210. But that is not what the school district and the superintendent did in this case. They did not surveil St. Augustine and catalogue its religious beliefs and practices to determine that it was affiliated with Roman Catholicism. Rather, they accepted St. Augustine's statement on its own website that it was a Roman Catholic school. Essentially, what the defendants did in this case was use the school's statement of religious affiliation on its website to fill in for the absence of a statement of affiliation or non-affiliation in the constituent documents that the school submitted to them. *Holy Trinity* does not hold that this was improper as a matter of state law.

■ My conclusion that *Vanko* and *Holy Trinity* are not dispositive does not resolve the plaintiffs' claim under state law. It is possible that the Wisconsin Supreme Court would build on these cases and interpret § 121.51(1) to require the superintendent to approve St. Augustine's proposed attendance area even though it overlaps with the attendance area of St. Gabriel, and even though both schools describe themselves as Roman Catholic schools. For example, the Wisconsin Supreme Court might agree with the plaintiffs and decide that § 121.51(1) should be construed in a way that allows religious schools to have overlapping attendance areas so long as they are not legally affiliated with each other, even if they both describe themselves as belonging to the same religious denomination.[5] Given this possibility, I conclude that the plaintiffs' state-law claim for judicial review of the superintendent's decision to deny St. Augustine its proposed attendance area "raises a novel or complex issue of State law," and that

---

5. The Wisconsin Supreme Court could also disagree with my conclusion that *Vanko* and *Holy Trinity* have not already interpreted

§ 121.51(1) as the plaintiffs believe it should be interpreted.

therefore I should decline to exercise supplemental jurisdiction over it. *See* 28 U.S.C. § 1367(c)(1).

■ This leaves the plaintiffs' federal claim, which is that, regardless of how the Wisconsin courts ultimately interpret § 121.51(1), the defendants violated the plaintiffs' rights by denying the Forros transportation aid to attend St. Augustine for the 2015–16 and 2016–17 school years. However, it is somewhat difficult to identify the precise contours of the plaintiffs' federal legal theories. In their brief, the plaintiffs contend that they have "several constitutional rights at issue" in this case. Pl. Br. at 15. The plaintiffs then identify several rights, including (1) a right to form and attend a private school that aligns with their religious beliefs, *id.*; (2) a right not to be discriminated against because they engage in religious exercise, *id.* at 16; (3) a right not to be denied government benefits based on a test that the government does not apply to nonreligious entities, *id.* at 16–17; and (4) a right "not to have the state excessively entangled in their religious practices," *id.* at 18–20. However, in a section of their brief entitled "[t]he Plaintiffs have been deprived of constitutionally protected rights," the plaintiffs contend that they were deprived of only the third right on their list: the right to receive government benefits on the same terms as nonreligious entities. *Id.* at 20–21. In this section, they argue that St. Augustine's "attendance area would have been approved as requested if it were a secular private school located precisely where St. Augustine is located." *Id.* at 20. Based on this part of their brief, I understand the plaintiffs to be arguing that the defendants' actions violated their rights under the Religion Clauses and the Equal Protection Clause by applying a test to St. Augustine that they would not have applied to a similarly situated nonreligious private school. *See Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,* 512 U.S.

687, 703, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (noting that it is "a principle at the heart of the Establishment Clause" that "government should not prefer one religion to another, or religion to irreligion"); *Ctr. for Inquiry, Inc. v. Marion Circuit Court Clerk,* 758 F.3d 869, 872–73 (7th Cir. 2014) (recognizing that the First Amendment and the Equal Protection Clause require a state to administer its laws neutrally as between different religions and as between religion and equivalent secular organizations).

The plaintiffs' "neutrality" argument is based on the premise that the defendants would have approved St. Augustine's attendance area if it were a nonreligious private school, rather than a religious private school. I will assume for purposes of this opinion that if St. Augustine were a nonreligious private school that was not affiliated with any "sponsoring group" that already operated a private school within the proposed attendance area, then the defendants would have approved its attendance area. But as discussed above, in *Vanko,* the Wisconsin Supreme Court inserted the "single sponsoring group" concept into § 121.51(1) to avoid the concern that the statute treated religious schools differently than secular schools. Thus, for purposes of adjudicating the plaintiffs' neutrality claim, the relevant comparator is not just any nonreligious private school, but a nonreligious private school that could be thought to be affiliated with a "sponsoring group" that already operates a school within the proposed attendance area.

The plaintiffs have pointed to no evidence in the summary-judgment record from which a reasonable trier of fact could conclude that either the Friess Lake School District or the state superintendent would, in violation of § 121.51(1) and *Vanko,* grant secular private schools that are affiliated with or operated by the same

sponsoring group overlapping attendance areas. And the defendants in their brief state that it is their understanding that "it would be well within the bounds of [state law] for a district to refuse overlapping attendance areas to two Montessori schools, even if they were incorporated as two separate legal entities." Def. Br. at 16. Although a party's statement in its brief is not evidence, the important point is that the defendants do not concede that they have treated or would treat secular private schools differently than they have treated St. Augustine, and the plaintiffs have not met their burden to produce evidence from which a reasonable trier of fact could conclude that the defendants either have treated or would treat such secular schools differently. They have not, for example, pointed to deposition testimony suggesting that the defendants would treat secular schools differently, and they have not submitted evidence suggesting that either defendant has granted secular private schools affiliated with the same secular sponsoring group, such as Montessori schools, overlapping attendance areas. Thus, the defendants are entitled to summary judgment on the plaintiffs' claim that the defendants violated the First Amendment and the Equal Protection Clause by applying a test to St. Augustine that they would not have applied to a similarly situated secular private school.

█ Having decided the plaintiff's "neutrality" claim, I believe I have decided the plaintiffs' only federal claim. However, at places in their briefs, the plaintiffs contend that the defendants' interpretation of § 121.51(1) caused them to "evaluat[e] competing religious claims" in a way that led to "excessive entanglement." Reply. Br. at 12. They argue that the defendants impermissibly made a religious judgment that both St. Augustine and St. Gabriel practice the same religion and therefore are affiliated with the same religious denomination. "Excessive entanglement" is a concept that derives from the Supreme Court's Establishment Clause jurisprudence; it is one of the prongs of the so-called "Lemon test" of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Under this prong of the test, a statute will be deemed unconstitutional if it "fosters an excessive government entanglement with religion." Id. at 613 (internal quotation marks omitted). In light of the plaintiffs' references to excessive entanglement, a question arises as to whether they are alleging that the defendants committed a constitutional violation by excessively entangling themselves in a religious matter. I do not believe that they are, but in case I am mistaken, I will also address whether the plaintiffs are entitled to damages under § 1983 based on an excessive-entanglement theory.

An initial issue is that the Lemon test and its entanglement prong are not designed to apply to a single decision made by state actors under a broader statutory scheme. Rather, the Lemon test is used to evaluate whether the entire statutory scheme or a broader governmental policy or practice is unconstitutional. For example, in Lemon itself, the Court found two state statutes unconstitutional because ongoing administration of the statutes would have led to excessive entanglement between church and state. See Lemon, 403 U.S. at 614–25, 91 S.Ct. 2105. Other cases evaluate whether an ongoing governmental policy or practice, even if not embodied in a statute, results in excessive entanglement. See Doe ex rel. Doe v. Elmbrook Sch. Dist., 687 F.3d 840, 842, 849 (7th Cir. 2012) (en banc) (evaluating whether school district's "practice" of holding "high school graduations and related ceremonies" at a church violated the Lemon test). The plaintiffs have not cited, and I have not found, a case holding that a governmental actor's single decision under a broader statutory scheme

can be deemed unconstitutional on the ground that it involved excessive entanglement. Rather, it is usually the entire statutory scheme or governmental policy that is evaluated for excessive entanglement. Where such entanglement is found, the entire statute or practice is deemed unconstitutional and invalidated.

■ Thus, in the present case, if the defendants' interpretation of § 121.51(1) were correct as a matter of state law (which is something that the state courts must decide), and their ongoing administration of the statute with respect to religious private schools resulted in excessive entanglement, then a question would arise as to whether the Wisconsin law that grants transportation aid to students of private schools is unconstitutional as a whole. Alternatively, perhaps only the "same religious denomination" sentence of § 121.51(1) would be unconstitutional, and it could be severed from the statute. But the defendants' single and potentially erroneous application of the statute to one religious school could not result in a finding of excessive entanglement. Cf. Nelson v. Miller, 570 F.3d 868, 881–82 (7th Cir. 2009) (finding that state actor's "one time" act of entanglement did not result in excessive entanglement). Accordingly, the defendants' single alleged act of entanglement could not have resulted in a violation of § 1983.

■ In case I am mistaken about whether a single act of entanglement could give rise to liability under § 1983, I also conclude that the defendants in this case did not excessively entangle themselves in a religious matter. "The general rule is that, to constitute excessive entanglement, the government action must involve 'intrusive government participation in, supervision of, or inquiry into religious affairs.'" Vision Church v. Vill. of Long Grove, 468 F.3d 975, 995 (7th Cir. 2006) (quoting United States v. Indianapolis Baptist Temple, 224 F.3d 627, 631 (7th Cir.2000)). Here, I will assume that, had the district or the superintendent made the kind of extensive inquiry into St. Augustine's religious affiliations that the superintendent made in Holy Trinity, then the defendants would have excessively entangled themselves in the plaintiffs' religious affairs. However, as I have explained, the defendants did not make that kind of inquiry into St. Augustine's religious beliefs and practices. Rather, because St. Augustine was obviously a religious school and did not submit any articles of incorporation or bylaws that identified or disclaimed its affiliation with a religious denomination, the defendants looked elsewhere to determine what St. Augustine "purport[ed] to be," as required by Holy Trinity. 82 Wis. 2d at 153, 262 N.W.2d 210. The defendants then turned to the statement on St. Augustine's website describing it as a "Roman Catholic School," and they accepted this statement at face value and concluded that St. Augustine was affiliated with the Roman Catholic denomination. These actions did not involve any participation in, supervision of, or intrusive inquiry into religious affairs.

The plaintiffs contend that the defendants' reliance on St. Augustine's describing itself as a Roman Catholic school involved the application of a "religious test." Although the plaintiffs do not precisely explain what they mean by "religious test," I understand them to be arguing that the defendants improperly concluded that all Roman Catholics have the same religious beliefs and follow the same religious practices and therefore all follow the same "religion." But this is not an accurate description of what the defendants did. What they did, instead, was conclude that, for purposes of § 121.51(1), Roman Catholicism is a single "religious denomination," even if there are branches within the denomination that have different religious

beliefs or follow different religious practices. The term "religious denomination," as used in the statute, is not a religious test. It does not require the state to evaluate the truth or falsity of any particular religious belief or to determine the sincerity of any person's religious beliefs. It is simply a secular term that is used for administering the statute. Thus, the state could determine that two schools that call themselves Roman Catholic are affiliated with the same religious denomination—as that term is used in the statute—even if the schools and their attendees would not consider themselves to have the same religious beliefs or to be following the same religious practices. Making this determination does not excessively entangle the state in a religious matter. It is no different than the state's concluding that two Montessori schools are affiliated with the same sponsoring group because they each use the label "Montessori," even though each school may practice the Montessori method a bit differently.

To be sure, one can envision difficulties with the state's routinely making judgments about whether two schools that describe themselves in a similar way are affiliated with the same religious denomination. The problem here is in defining what the statute means by "religious denomination." For example, in the present case, St. Augustine did not describe itself as just a "Roman Catholic school," but as a "*traditional* Roman Catholic school." What criteria should the state employ when determining whether two schools that describe themselves similarly, but not identically, are affiliated with the same religious denomination, as that term is used in the statute?[6] Perhaps creating and applying

such criteria to the attendance areas of multiple private religious schools would lead to excessive entanglement or other constitutional problems in the long run. Similar problems could arise in the secular context: what happens if two private Montessori schools describe themselves slightly differently? To avoid these problems, the state may wish to interpret § 121.51(1) as the plaintiffs have—that is, to make the test of affiliation always turn on the school's corporate organization rather than on its affiliation with a religious denomination or a secular sponsoring group. But as I have explained, I do not read the existing state cases to have already interpreted § 121.51(1) in this way. And because the proper interpretations of "religious denomination" and "sponsoring group" present novel questions of state law, I will decline to exercise supplemental jurisdiction over the plaintiffs' state-law claim.

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion for summary judgment is **GRANTED IN PART**, that is, insofar as it pertains to the plaintiffs' federal claims.

**IT IS FURTHER ORDERED** that the plaintiffs' motion for summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that the plaintiffs' state-law claim for judicial review of the superintendent's final decision under Wis. Stat. § 121.51(1) is **REMANDED** to state court pursuant to 28 U.S.C. § 1367(c).

---

6. Notably, this problem could arise even if the superintendent considered nothing other than a school's description of itself in its articles of incorporation, in accordance with *Holy Trinity*. For example, what if St. Augustine's articles of incorporation described the school as

a "traditional Roman Catholic school"? In this example, the state would have to make a judgment about whether Roman Catholicism and "traditional" Roman Catholicism are each part of the same denomination.

**IT IS FURTHER ORDERED** that the superintendent's motion to dismiss is **DE-NIED** as **MOOT.**