In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2333

ST. AUGUSTINE SCHOOL, *et al.*,

*Plaintiffs-Appellants*,

*v.*

TONY EVERS, in his official capacity, as Superintendent of Public Instruction, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:16-cv-00575 — **Lynn Adelman**, *Judge.*

ARGUED NOVEMBER 29, 2017 — DECIDED OCTOBER 11, 2018

Before WOOD, *Chief Judge*, and RIPPLE and KANNE, *Circuit Judges*.

WOOD, *Chief Judge*. St. Augustine School, along with Joseph and Amy Forro, sued Wisconsin's Superintendent of Public Instruction and Friess Lake School District for refusing to provide school transportation (or equivalent cash benefits) to the Forros' children. The school and family assert that the

state denied them this benefit in violation of the Establishment and Free Exercise Clauses of the First Amendment.

The district court granted summary judgment for the defendants, and we now affirm. Contrary to the plaintiffs' assertions, the record does not establish that the Superintendent or the school district furnished or withheld public benefits on the basis of non-neutral religious criteria. Nor does the evidence support the claim that public officials impermissibly determined the school's affiliation on the basis of theology, ecclesiology, or ritual. Instead, it shows that public officials applied a secular statute that limits benefits to a single school affiliated with *any* sponsoring group—and, when St. Augustine declared itself to be Catholic, they took the school at its word.[1]

## I

Wisconsin law requires school districts to bus private-school students,[2] WIS. STAT. § 121.54, but that obligation extends only to one private school "affiliated with the same religious denomination" within each geographic attendance

---

[1] The dissent characterizes the Superintendent's actions as an "extensive" examination of the school's theological affiliation. *Post* at 5 n.8. As we explain below, however, that is not at all what happened. All the Superintendent did was to look at the school's own description of itself as "Catholic" and take its word for it. He did not delve into corporate niceties, educational materials, or anything else that would inappropriately have entangled him with matters of religion. Nor did the Superintendent ever assume, one way or the other, anything about the school's affiliation with the archdiocese of Milwaukee or any other subdivision of the Catholic Church, or the similarity (or differences) in the beliefs held by each one.

[2] Districts may discharge this obligation by making a direct payment to pupils' parents. WIS. STAT. § 121.55(1)(b).

area, WIS. STAT. § 121.51. In an effort to avoid an unconstitutional interpretation of this limitation, the Wisconsin Supreme Court has construed section 121.51 to reach any two private schools "affiliated or operated by a single *sponsoring group*, whether … secular or religious." *State ex rel. Vanko v. Kahl*, 52 Wis. 2d 206, 215 (1971) (emphasis added). According to that court, the statute's reference to *denominational* affiliation is not meant to introduce a religious criterion, but rather to establish that the test of affiliation is not limited to "operation by a single agency or set of trustees or religious order." *Id*. at 215. For example, the court explained, schools operated by the Franciscan Order and Jesuit Order would "be considered, along with diocesan schools, as part of the Catholic school system … because all are 'affiliated with the same religious denomination.'" *Id.* at 215–16. At the same time, officials may not determine the affiliation of a religious school by monitoring and evaluating its practices or personnel. *Holy Trinity Cmty. Sch., Inc. v. Kahl*, 82 Wis. 2d 139, 154–58 (1978). Instead, public officials "are obliged to accept the *professions* of the school and to accord them validity without further inquiry." *Id.* at 155 (emphasis added).

This case arose when St. Augustine applied for transportation for its students, including the Forros' children. Invoking section 121.51, the Friess Lake School District denied its request, and Wisconsin's Superintendent of Public Instruction, Tony Evers, upheld that decision. At the relevant time, St. Augustine described itself as a Catholic school. In its request for busing, the school told the district that it was "an independent, private Catholic school." In the section of its website entitled "About Us," St. Augustine stated that it is "an independent and private traditional Roman Catholic School"

that "loves and praises all the traditional practices of the Catholic Faith" and "recognizes its spiritual custodial duty of establishing an authentic Catholic environment."[3]

The problem was that there was already a Catholic school within the same catchment zone—St. Gabriel School, which was operated by the Archdiocese of Milwaukee. Relying on each school's self-classification, the school district and Superintendent determined that both schools were affiliated with the same sponsoring group, as *Vanko* used that term. (They may have thought that if the Franciscans and Jesuits were considered as "the same" for purposes of Wisconsin law, then so were St. Augustine and St. Gabriel.) Because St. Gabriel had already qualified for busing, the district and Superintendent disclaimed any obligation under section 121.51 to provide transportation services or their monetary equivalent to St. Augustine's students.

St. Augustine and the Forros sued the school district and Superintendent in state court for violations of their federal civil rights under 42 U.S.C. § 1983 and for violations of the state busing statute; the defendants removed the case to federal court. St. Augustine asserts that its students are entitled to publicly subsidized transportation and that, in rejecting their application, the state impermissibly probed into its religious beliefs. It maintains that even though it identifies itself as Catholic (specifying Roman Catholic in at least one place),

---

[3] Although not pertinent here (because it was not a factor on which the Superintendent relied), we note that St. Augustine's employment application asks applicants about their "Catholic Background," including their "views as a Catholic teacher on why you wish to teach in a small, private school teaching in the Catholic tradition" and "what [they] expect from a truly Catholic educational institution."

it was nonetheless distinct from the diocesan schools in its curriculum and religious practices. The district court remanded the state claims to the state court and granted summary judgment in favor of the defendants on the federal claims. St. Augustine and the Forros appeal from that judgment.

## II

Because this case comes to us following summary judgment, we have assessed the plaintiffs' claims and evidence *de novo*, *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015), mindful that summary judgment is appropriate in the absence of a "genuine dispute as to any material fact" if "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986). For the plaintiffs to move ahead on their section 1983 claim, the record must contain evidence that would permit a trier of fact to find that "(1) they held a constitutionally protected right; (2) they were deprived of this right in violation of the Constitution; (3) the defendants intentionally caused this deprivation; and (4) the defendants acted under color of law." *Donald v. Polk Cnty.*, 836 F.2d 376, 379 (7th Cir. 1988).

Plaintiffs argue that the application of section 121.51 deprived them of their First Amendment rights in two ways. First, they assert that the defendants violated the Free Exercise Clause by depriving St. Augustine (and the parents of its students) of a public benefit on account of their religion. As we explain in more detail below, this theory fails because, as construed by the Wisconsin Supreme Court, section 121.51 is a facially neutral and generally applicable law that deprives *all* private schools—religious and secular alike—of receiving

a subsidy already claimed by another school affiliated with the same group or organization. Second, plaintiffs suggest that the defendants' application of section 121.51 violated the Establishment Clause by entangling the state actors with religious doctrine and belief when they categorized St. Augustine as Catholic. This allegation lacks support in the record, which shows that it was St. Augustine—not the state—that chose to define itself as Catholic. Ironically, it is St. Augustine's approach, not the state's, that would require officials to look beyond outward expressions of affiliation to engage in potentially impermissible inquiries into the ecclesiological boundaries of religions and denominations. The district court thus properly dismissed this suit.

## A

As a preliminary matter, plaintiffs incorrectly assert that a factual dispute precludes summary judgment. They believe that the record could establish that the defendants consulted St. Augustine's original articles of incorporation, which declared the institution a nondenominational Christian school, before they rejected its busing application. Had the defendants known of the articles' language, the argument goes, an impermissible inquiry into the school's religious doctrine or practice must have prompted its classification as Catholic. But plaintiffs have failed to carry their burden of producing evidence to support their assertion that the defendants looked at the document. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). Without any evidence that they did so, a secondary

dispute over whether St. Augustine submitted the original articles of incorporation to the state is immaterial.

Although plaintiffs suggest that a footnote in the Superintendent's decision proves that he, at least, pulled and reviewed the articles on his own, they misconstrue that note. The footnote states that St. Augustine "did not provide the complete Articles of Incorporation," which "according to the online records of the Wisconsin Department of Financial Institution" have remained in effect since their 1981 filing. This statement does not establish that the Superintendent ever saw the articles—it indicates only that he saw records of their filing. (And, while we do not base our opinion on this fact, we note that the website in question produces only a docket-style list of filings without links to their contents. *Corporate Records, Saint Augustine School, Inc.*, WIS. DEP'T OF FIN. INSTITUTIONS, https://www.wdfi.org/apps/CorpSearch/Details.aspx?entityID=6N08664&hash=474157237&searchFunctionID=9f86b932-7cef-4bc9-a6a5-7222036a7830&type=Simple&q=saint+augustine+school (last visited Oct. 11, 2018).) Therefore, even if it were relevant to a First Amendment analysis, plaintiffs have put forward no evidence to suggest that the defendants knew about and ignored the commitment to interdenominational Christianity professed in St. Augustine's bylaws. Because plaintiffs had no constitutional right under the First (or any) Amendment to have the defendants consult St. Augustine's articles of incorporation, their assertions that the school submitted the articles of incorporation cannot create a factual dispute sufficient to preclude summary judgment.

B

We now turn to the heart of this case: the constitutional claims. We conclude that the defendants did not violate the Free Exercise Clause when they denied St. Augustine's busing application pursuant to the religiously neutral and generally applicable grounds provided in section 121.51. Since *Employment Division v. Smith*, the Supreme Court has consistently held that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" 494 U.S. 872, 879 (1990) (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring)). That rule resolves the present case. The defendants refused to bus pupils to St. Augustine because another school—St. Gabriel—shared its institutional affiliation and served the same catchment zone. That the schools' shared affiliation happened to follow denominational lines in this case does not entitle plaintiffs to an exemption from a restriction placed on all private schools that have a common sponsoring group, as Wisconsin law defines it.

Plaintiffs' argument to the contrary rests on a misunderstanding of section 121.51. They repeatedly complain that the defendants denied St. Augustine (and its families) a public benefit because of St. Augustine's religious beliefs or practices. We do not doubt that section 121.51 foists a choice on religious families and schools. It requires parents to decide whether to elect the school that qualifies for benefits, or to forgo the benefits and select a school that better reflects their preferred ritual, doctrine, or approach. Here, the Forros could send their children to a school that more precisely reflects

their religious values only if they declined transportation benefits.

For its part, St. Augustine had to choose between identifying as Catholic and securing transit funding for its students. Were we presented with nothing but the text of section 121.51, which would appear to operate only with respect to religious schools, plaintiffs might have a strong case. To the extent that the statute "denies a generally available benefit solely on account of religious identity," it would "impose[] a penalty on the free exercise of religion." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017). Strict scrutiny would then apply, see *id*. at 2024, a burden that the defendants in this case do not attempt to meet.

Yet the Wisconsin Supreme Court took that problem off the table when it authoritatively construed the statute to avoid any such constitutional problem. See *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004). As the state supreme court reads the statute, section 121.51 imposes a neutral and generally applicable limitation on transportation funding. Its ban on busing services in overlapping attendance areas applies "to *all* private schools affiliated or operated by a single sponsoring group, whether such school operating agency or corporation is secular or religious." *State ex rel. Vanko*, 52 Wis. 2d at 215 (emphasis added). The state supreme court interpreted the statutory language singling out "private schools affiliated with the same religious denomination" as serving only to establish affiliation with a denomination as the operative limitation "rather than operation by a single agency or set of trustees or religious order." *Id*. at 465. In determining affiliation with a religious denomination, the

state generally must accept the school's own profession of affiliation or non-affiliation. *Holy Trinity Cmty. Sch., Inc.*, 82 Wis. 2d at 155–58.

Thus, section 121.51 bars two self-identified Catholic schools from receiving transit subsidies, but it also bars funding two Montessori schools, two International Baccalaureate® schools, or two French International schools. As in the case of St. Augustine, the bar would apply even though the same corporate parent did not own or control both institutions and thus the articles of incorporation would reflect two entities. The reason why St. Augustine cannot demand services within its desired attendance zone is not because it is a Catholic school; it is because—by its own choice—it professes to be affiliated with a group that already has a school in that zone.[4] By the same token, Wisconsin is not denying the Forros a transit subsidy because they are Catholic or because they seek to send their children to Catholic school. It funds transportation for all of the Catholic families who send their children to St. Gabriel. The problem for St. Augustine is not that it is Catholic; it is that it is second in line.

Because section 121.51 does not deny benefits *on the basis of* their religion, neither St. Augustine School nor the Forros can obtain relief under the Free Exercise Clause. See *Smith*, 494 U.S. at 879. Section 121.51 imposes a neutral and generally applicable restriction on transit funding. The defendants thus did not violate the Free Exercise Clause when they relied on section 121.51 to deny St. Augustine's busing application.

---

[4] We know from *Holy Trinity* that if St. Augustine professed to be anything but Catholic, that statement too would have to be taken at face value, and we would not have this case.

C

Plaintiffs also assert that, as applied in this case, section 121.51 violates the Establishment Clause. We agree with them that the state may neither define nor police religious ortho-doxy. But they have not shown that the state did any such thing. Contrary to the dissent's assertions, the record contains no evidence of an impermissible inquiry into the religious character of St. Augustine, let alone a comparison of the re-spective doctrines and practices of St. Augustine, St. Gabriel, and other Catholic institutions.

Had the defendants applied a religious test to establish de-nominational affiliation, we can assume that they would have violated *Lemon*'s prohibition of entanglement between gov-ernment and religion. *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971). A long line of cases prohibits secular courts from de-lineating religious creeds or assessing compliance with them. *E.g.*, *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440 (1969) (pro-hibiting courts from judging adherence to denomination's traditional doctrines). In fact, the state may not even monitor a religious school to identify which aspects of its curriculum and courses contain religious content generally. *New York v. Cathedral Acad.*, 434 U.S. 125, 132–33 (1977) (disapproving of a scheme that required state to identify "any religious content in various classroom materials" as part of a reimbursement process, *id*. at 133); *Lemon*, 403 U.S. at 619 (invalidating Rhode Island salary supplements for parochial teachers' *secular* teaching because "comprehensive, discriminating, and con-tinuing state surveillance w[ould] inevitably be required to ensure that" teachers' religious beliefs did not infect their

teaching). Thus, had the defendants determined that St. Augustine was Catholic on the basis of an affinity between its teachings or practices and those sanctioned by chosen dioceses, orders, or prelates, we would have found the defendants' inquiry to be unconstitutional.

Plaintiffs assert that such a forbidden probe lay behind the denial of St. Augustine's busing application. They argue that the defendants "based their finding of affiliation on the conclusion that St. Augustine and St. Gabriel were *theologically* connected even though St. Augustine said that it was 'religiously distinct' from the schools of the Archdiocese." The current system, St. Augustine argues, impermissibly permits the state "to decide who is and is not in the same religious denomination based on something other than legal and secular connections, and to ignore the claims of religious adherents about whether they are and are not religiously distinct."

The problem with St. Augustine's argument is that the school district and state superintendent did *not* consider St. Augustine's theology or its religious practices. They did not, to use plaintiffs' words, "ignore the claims of religious adherents about whether they are [or] are not religiously distinct" from another denomination. The defendants did not independently assign the label "Catholic" to St. Augustine. St. Augustine did. The defendants read and credited St. Augustine's statements on its website and busing request form that it was a Catholic—specifically a Roman Catholic—school. Defendants properly avoided wading into any discussion about whether each school faithfully operates within the Catholic tradition because each one calls itself a Catholic School. The dissent claims that the state superintendent "examined extensively the theological statements on the School's website and

determined that it evinces an affiliation with the Catholic Church." But it cites a portion of the Superintendent's decision that does no more than quote verbatim the school's own description of itself as a "Roman Catholic School" providing an education to "the children of our Catholic community" while "lov[ing] and prais[ing] all the traditional practices of the Catholic faith." R. 26-10, at 7. Taking a party's repeated chosen label at face value hardly constitutes a deep-dive into the nuances of religious affiliation.

Plaintiffs contend that section 121.51 also required the defendants to consider statements in the school's articles of incorporation and bylaws, which purportedly would have shown that the school's leadership disclaimed affiliation with the Catholic Church. But why does the Constitution compel exclusive reliance on that evidence, as opposed to the school's express statement on its application for benefits? We know of no such rule. Of course, as *Holy Trinity* illustrates, St. Augustine is free to change its affiliation, and the state must also respect such a change. See 82 Wis. 2d at 146. But at least in our case, all evidence viewed by the school district and superintendent indicated that St. Augustine and St. Gabriel professed affiliation with the same Roman Catholic Church.

We see no evidence to support plaintiffs' and the dissent's hypothesized parade of horribles. Under the current system, they contend that the state could redefine denominational boundaries and "lump the Lutherans of the Missouri Synods in with those in the Evangelical Lutheran Church in America" while "Anglican Catholics could be thrown in with the Roman Catholics" because "each of them use the 'Lutheran,' [and] Catholic,' … monikers." That is just to say, however, that there can be a question about which entity is the "group"

to which section 121.51 refers. We assume that the Missouri Synods would be entitled to argue that they are a different group from the Evangelicals, that the Orthodox Jews are entitled to argue that they are a different group from Reformed Jews, and that Shi'a Muslims can urge that they are different from Sunnis. We are content to save those cases for another day. In the present case, both St. Augustine and St. Gabriel self-designated as Roman Catholic, and that is enough. If we were presented with a state's refusal to recognize a denomination or a public official's attempt to serve as an arbiter of a religious schism, we would have a different case. We agree with our dissenting colleague that labels may not fully capture the plurality of religious beliefs in America. But for Wisconsin's statute to pose any meaningful limitation on the state's provision of busing, school districts must be able to rely on self-adopted labels.

Ironically, it is St. Augustine and the Forros—not the state—that are asking us to undertake an unconstitutional analysis of religious belief. They contend that St. Augustine is distinct because it "practices its religion differently than St. Gabriel." They argue that "even if similar practices or beliefs *could* be the basis for 'affiliation,'" the denial of St. Augustine's busing application cannot stand because the defendants "explicitly did not look at or compare St. Augustine's beliefs and practices with St. Gabriel's to determine whether they were sufficiently comparable such that they could be considered 'affiliated' or sponsored by some group.'" Yet considering

whether a difference in belief constitutes a difference in de-nomination is precisely what *Presbyterian Church* forbids.[5] 393 U.S. 440. The entire point of the approach endorsed by the Wisconsin Supreme Court and followed by the defendants is to take matters of doctrine and belief out of the secular deter-mination of institutional affiliation. We will not pervert the Establishment Clause to declare internal doctrinal differences a matter of state concern. Nor are we prepared to say, in con-flict with the Wisconsin Supreme Court, that the state's only choice is to assume that each and every school is unique and thus all children must receive transportation benefits.

Before concluding, we add a word about why we think it both unnecessary and inappropriate to abstain *sua sponte* from deciding the issues before us pursuant to the doctrine of *Rail-road Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941). The Wisconsin Supreme Court has already resolved the criti-cal questions of state law in *Vanko* and *Holy Trinity Church*. It has told state authorities how to apply the test of affiliation with a single sponsoring group, and it has stressed that the responsible state officials must accept a religious organiza-tion's self-characterization. It has also disapproved the factor on which our dissenting colleague relies so heavily—owner-ship or control by a single entity. *Pullman* does not require a federal court to stay its hand simply because a state legislature

---

[5] It is hardly unusual for churches within the same denomination to display some differences. One Lutheran church might have a pastor who emphasizes public service, while another might have a minister who em-phasizes self-reflection and atonement. One might approach the Bible from a strict-construction viewpoint, while another may take a more met-aphorical view. Differences in theological approaches do not necessarily create different sponsoring groups, no matter how genuinely each congre-gation feels about its choices.

or court might surprise us by reversing course. See *Kusper v. Pontikes*, 414 U.S. 51, 55 (1973) (rejecting *Pullman* abstention where alternative interpretation of state law was "foreclosed by the decision of the" state high court).

The *Pullman* doctrine aims to avoid an unnecessary adjudication of the constitutionality of a state statute. Its purpose is not served unless there is "some risk that the statute will be found unconstitutional unless narrowed." *Mazanec v. N. Judson-San Pierre Sch. Corp.*, 763 F.2d 845, 847 (7th Cir. 1985). As it comes to us, this was not a close case. St. Augustine complains that its religious exercise was burdened by a neutral and generally applicable law. It roots an Establishment Clause violation in the *failure* of the district and state officials to contrast its religious dogma and practices with those of the Roman Catholic diocese. And that is what inevitably would be required: two schools could be incorporated under the same entity and nonetheless differ just as much as St. Augustine and St. Gabriel do. This is not one of those cases in which we must side-step our obligation to resolve a case that is properly before us.

### III

The district court properly granted summary judgment for the defendants. St. Augustine and the Forros have not shown a violation of their First Amendment rights. As applied here, section 121.51 neither impinged on plaintiffs' religious liberties nor impermissibly engaged the state in matters of religious doctrine. We therefore AFFIRM the judgment of the district court.

RIPPLE, *Circuit Judge*, dissenting. The people of Wisconsin have recognized in their state constitution the importance of ensuring that every Wisconsin schoolchild receives safe and secure transportation to the school chosen by his parents, whether that school be a state-operated school, a secular private school, or a religiously oriented private school.[1] As the Wisconsin Supreme Court has noted, by enacting this state constitutional provision and its implementing legislation,[2] Wisconsin has recognized that "the same consideration of safety and welfare should apply to public and private students alike." *Cartwright v. Sharpe*, 162 N.W.2d 5, 11 (Wis. 1968).[3] Wisconsin's choice accords with the Supreme Court's recognition of the important liberty interest of parents to choose the educational environment of their children. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925).

---

[1] *See* Wis. Const. art. I, § 23.

[2] Wisconsin Statutes section 121.54(2)(b) requires the school board of each district operating high school grades to provide transportation "for each pupil residing in the school district who attends any elementary … or high school grade at a private school located 2 miles or more from the pupil's residence, if such private school is a school within whose attendance area the pupil resides and is situated within the school district." This transportation obligation can be fulfilled in a variety of ways. *See* Wis. Stat. § 121.55. This school district's choice of the way in which it would fulfill such an obligation is not at issue in this case.

[3] We need not decide today whether the Constitution of the United States requires such evenhanded treatment of public and non-public school students. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017).

In implementing the State's commitment, conscientious government administrators necessarily face practical problems. Limited funding is one of them. The Wisconsin legislature attempted a partial solution to this perennial problem by mandating that each private school is entitled to bus transportation within an established "attendance area"[4] and by also providing that, except in the case of single-sex schools, "[t]he attendance areas of private schools *affiliated* with the same religious denomination shall not overlap."[5] The statute, however, does not define what it means for a school to be "affiliated" with a denomination. There is no evidence in this record that this affiliation provision is anything other than a good-faith attempt to implement the transportation program in a sensible, fiscally responsible manner. Nevertheless, the provision's ambiguity has caused significant disagreement, resulting in two decisions by the Wisconsin Supreme Court. Before focusing on the present case, therefore, I pause to examine these two cases of the Wisconsin Supreme Court. Both interpreted the statute in the crosslight of Religion Clause concerns and shed considerable light on the path that we ought to follow in the case before us.

In *State ex rel. Vanko v. Kahl*, 188 N.W.2d 460, 464 (Wis. 1971), the Supreme Court of Wisconsin focused directly on the language that, on its face, forbids providing transportation services to children of religiously operated private schools "affiliated with the same religious denomination" as another school already receiving transportation in the same

---

[4] Wis. Stat. § 121.51(1).

[5] *Id.* (emphasis added). The single-sex school exception is not implicated in this case.

attendance area. The statute contained no similar limitation for non-religious private schools, and the Wisconsin court recognized that this difference in treatment placed an additional burden on children attending a religiously affiliated private school—a burden that was not shared by children attending a non-religious private school. The court therefore construed this provision to apply equally to children in both religiously affiliated private schools and non-religiously affiliated schools. Although not invoking squarely the rule that courts should construe a statute to avoid doubts about its constitutionality, the Wisconsin high court frankly recognized that disparity in the treatment of children attending religious schools would create "an apparent constitutional infirmity." *Id.* The statute's reference to religiously affiliated schools, noted the court, was simply to ensure that schools conducted by religious orders were considered affiliated with a religious group, even if these schools were not legally owned by the sponsoring religion. *Id.*[6] As construed by the court in *Vanko*, therefore, the statute forbade overlapping attendance zones only when a private school was "affiliated or operated by a single sponsoring group, whether such school operating agency or corporation is secular or religious." *Id*. at 465.

*Vanko* made clear that all private schools, not just religious private schools, were subject to the overlapping attendance area limitation. It had no occasion to come to grips with just how a school district should determine the "affiliation" of a religious private school with a "sponsoring group." In *Holy Trinity Community School, Inc. v. Kahl*, 262 N.W.2d 210 (Wis. 1978), the Wisconsin Supreme Court addressed this question.

---

[6] The court later referred to this last explanation as dicta. *See Holy Trinity Cmty. Sch., Inc. v. Kahl*, 262 N.W.2d. 210, 212 (Wis. 1978).

In that case, a school of the Catholic Archdiocese of Milwaukee, desiring a larger attendance area that would overlap with other diocesan schools, closed and then immediately reopened under new articles of incorporation and bylaws that did not identify it as a Catholic school and that stated that it had no formal religious affiliation. It continued to employ many of the same teachers, to enroll many of the same students, and to lease, for a dollar a year, its building from the Catholic parish in which it was located. It conducted its religious instruction in a "released-time" program. *Id.* at 211.

The State Superintendent of Instruction concluded, on these facts, that the school remained affiliated with the Catholic Church and refused to provide transportation. The Wisconsin Supreme Court did not think that the Superintendent's determination was sustainable. Relying principally on the decisions of the United States Supreme Court in *New York v. Cathedral Academy*, 434 U.S. 125 (1977), *Levitt v. Committee for Public Education & Religious Liberty*, 413 U.S. 472 (1973), and *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the court held that the Superintendent should not make such a detailed inquiry into the school's religious practices to determine whether it was *affiliated* with another religious body. In the court's view, such an inquiry would have the primary effect of aiding religion or would result in an excessive entanglement of the government in religious affairs. The Superintendent must accept, said the court, the facial validity of the charter and bylaws of the school. *Id.* at 216.[7]

---

[7] The majority maintains that the Wisconsin Supreme Court said in *Holy Trinity* that a court "generally must accept the school's own profession of

In *Vanko* and *Holy Trinity*, the Wisconsin Supreme Court adopted the salutary practice of employing "neutral principles of law," *Jones v. Wolf*, 443 U.S. 595, 600 (1979), in order to avoid slipping into the constitutionally impermissible quagmire of defining religious doctrine and practice. *Cf. Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708–09 (1976).

Here, the State Superintendent failed to follow these Wisconsin decisions. The articles of incorporation state that "[t]he purposes for which the Corporation is organized are to create, establish, maintain, and operate an interdenominational Christian school for the instruction for children in the primary and secondary grades."[8] Rather than grounding his decision in the articles of incorporation and by-laws as he was required to do under state law, he decided to undertake an independent investigation and rested his decision on statements he found on St. Augustine's website.[9]

Faced with a clear failure of the State Superintendent to follow the decisions of the Supreme Court of Wisconsin, the

---

affiliation or non-affiliation." Majority Op. at 10. Its citation to 82 Wis. 2d at 155–58 apparently refers to the Wisconsin court's discussion of the judicial obligation not to pierce the articles of incorporation or the bylaws. There, the Supreme Court of Wisconsin observers: "we hold only, where a religious school demonstrates by a corporate charter and bylaws that it is independent of, and unaffiliated with, a religious denomination, that in the absence of fraud or collusion the inquiry stops there. To make the further inquiry, as attempted by the Superintendent of Public Instruction, is to involve the state in religious affairs and to make it the adjudicator of faith." *Holy Trinity*, 82 Wis. 2d at 157–58.

[8] R.26-1 at 1.

[9] *See* R.26-10 at 7.

district court undertook a close examination of *Vanko* and *Holy Trinity*. It began its analysis by admitting frankly that, given the holdings in those two cases, the Wisconsin Supreme Court might well "build on these cases" and interpret the statute to require the State Superintendent to approve St. Augustine's proposed area "even though it overlaps with the attendance area of St. Gabriel, and even though both schools describe themselves as Roman Catholic schools."[10] However, the district court then examined the website of St. Augustine School and, noticing that the school described itself as "Catholic," the court then decided that the holdings of the Wisconsin Supreme Court permitted an examination beyond the legal documents of incorporation into the "school's religious denomination."[11] The court apparently never considered ab-

---

[10] R.41 at 16.

[11] *Id.* at 13. The district court noted that *Vanko* had described the required nexus as "affiliated or operated by a single sponsoring group." *Id.* It read *Holy Trinity* as not limiting the inquiry to the private school's constituent documents if those documents do not affirmatively disclose that the school has a particular affiliation. *Id.* at 15. That interpretation is belied by the *Holy Trinity* court's reliance on *Bradfield v. Roberts*, 175 U.S. 291, 297 (1899), in which the operative document did not disclose the religious affiliation of the institution. *See id.* at 297–98 ("Nothing is said about religion or about the religious faith of the incorporators of this institution in the act of incorporation. … Whether the individuals who compose the corporation under its charter happen to be all Roman Catholics, or all Methodists, or Presbyterians, or Unitarians, or members of any other religious organization, or of no organization at all, is of not the slightest consequence with reference to the law of its incorporation, nor can the individual beliefs upon religious matters of the various incorporators be inquired into.").

staining until the parties could obtain a more precise defini-
tion of the word "affiliated" than the one offered in *Holy Trin-
ity*.[12] Rather, it took the School's use of the term "Catholic" as,
in effect, an admission of affiliation with the schools of the
Archdiocese.[13]

My colleagues follow the lead of the district court. The
panel's opinion culls out of the School's self-description on its
website the word "Catholic." In their view, if two schools em-
ploy the same label—"Catholic"—to describe themselves,
they are "affiliated."

In my view, there are several problems with this approach.
The first is one of elemental fairness. The term "Catholic" ap-
pears in the school website in the broader context of a
wide-ranging description of St. Augustine School, a text that
sets forth the educational philosophy of the institution and
the theological principles that animate that educational phi-
losophy. Taking the single term "Catholic" out of this context

---

[12] Notably, the defendants had removed this case from the state court
where the plaintiffs had commenced the action. The state court no doubt
would have followed the Wisconsin precedent discussed in the text and
concluded that the Superintendent was not permitted to ignore St. Augus-
tine's claim of legal independence.

The defendants' removal of this case to federal court simply has al-
lowed them to avoid answering to the Wisconsin Supreme Court for their
failure to follow *Trinity Lutheran*, 137 S. Ct. at 2024. Had they obeyed the
holding of that case, they would have treated religious and non-religious
schools evenhandedly and, in the process, avoided any need to address a
constitutional question.

[13] Earlier in its opinion, the district court had surmised that St. Augustine
might be "Traditionalist Catholic." R.41 at 3. It then said that it mentioned
this point "only to provide some background information on how St. Au-
gustine differs from a diocesan school." *Id.*

and employing it as an outcome-determinative label obviously raises a basic question of fairness, especially when we clearly are forbidden to evaluate the remainder of the context to determine whether the theological principles set forth there are indeed embraced by the Roman Catholic Church, which operates St. Gabriel in the same district.

I recognize, as do my colleagues, that permitting the state to derive denominational affiliation through an examination and judgment of theological doctrine would pose different constitutional concerns. I suggest, instead, that the Constitution requires the state to rely on the same neutral principles it would apply to a non-religious school. It should accept, as the Wisconsin courts certainly would, St. Augustine's independent corporate structure as proof that it is not "affiliated" with St. Gabriel. The materials submitted to the Superintendent made the Superintendent well aware that St. Augustine is legally independent from St. Gabriel and the Archdiocese.[14]

Secondly, the court's selective use of the term "Catholic" rests on the assumption that, for purposes of our Free Exercise analysis, a single term, even when culled from its context, can describe accurately the religious values and aspirations of an individual or a group of individuals. Labels work very well for identifying commodities in a supermarket, but they are ill fitted for protecting the religious liberty of an *individual*

---

[14] *See, e.g.*, R.26-9 (St. Augustine's request for Superintendent to review the school district's denial of transportation benefits, emphasizing St. Augustine's independence from the Archdiocese and separately chartered corporate structure); R.33-6 at 3–4 (school district's submission to Superintendent, recognizing that St. Augustine is "incorporat[ed] under a different charter" and has a "differing organizational structure[]" from an Archdiocesan school).

American. Our constitution recognizes "the right of every person to freely choose *his own course*" with respect to "religious training, teaching and observance." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 222 (1963) (emphasis added). A cornerstone of our Religion Clauses jurisprudence is the right of each individual to define personal religious beliefs not according to institutional norms but according to *personal* religious commitments. *See Kaufman v. McCaughtry*, 419 F.3d 678, 681 (7th Cir. 2005). The congruity of personal beliefs with those of a known religious organization is beside the point. Personal beliefs may have some overlap with an institutional religion; or they may be heretical or overly zealous variations of institutional beliefs. *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012). They may even evince lax adherence to a known religion. *Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 1988). But if an individual sincerely holds those beliefs, the Religion Clauses protect them. *Grayson*, 666 F.3d at 454 ("Religious belief must be sincere to be protected by the First Amendment, but it does not have to be orthodox.").[15]

---

[15] We have held that the government may inquire into the sincerity of a person's beliefs, *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012), and that it can be appropriate to examine, in a measured and non-intrusive manner, the congruity of a person's beliefs to those of the religion that he professes in an effort to ascertain the sincerity of his beliefs, *Nelson v. Miller*, 570 F.3d 868, 880–82 (7th Cir. 2009). *But see Koger v. Bryan*, 523 F.3d 789, 799–800 (7th Cir. 2008). Similarly, civil government need not tolerate sham or fraudulent conduct designed to avoid legitimate and evenhandedly applied civil obligations. *See, e.g., Welsh v. United States*, 398 U.S. 333, 339–40 (1970) (noting that it is necessary to consider whether an individual's beliefs are, in fact, "religious" in nature before granting that individual conscientious objector status under the Selective Service Act); *United States v.*

Given our national commitment to freedom of *personal* conscience, it is not surprising that our history, even before the founding of the Republic, is filled with dissident individuals and groups who have disagreed with larger bodies and yet insisted that *they*, not the larger group, have remained faithful to the principles of the original group. As the Supreme Court noted in *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 715 (1981), "[i]ntrafaith differences … are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses." The "guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. … [I]t is not within the judicial function and judicial competence to inquire whether [one person or another] correctly perceive[s] the commands of their common faith." *Id.* at 715–16.

Today's holding permits a local school board to deny children an important safety protection because their parents have concluded, based on their religious beliefs, that St. Augustine School embodies their personal faith commitment and that the Archdiocesan School does not. The court permits the local school board to exert significant pressure on those parents to bend to the school board's determination that what

---

*Seeger*, 380 U.S. 163, 185 (1965) ("[W]e hasten to emphasize that while the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.' This is the threshold question of sincerity [and ]a prime consideration to the validity of every claim for exemption as a conscientious objector."). But, in the end, it is the sincerity of their beliefs, not their orthodoxy, that is the touchstone for constitutional protection. These are well-settled principles.

they believe to be an important religious difference between the two schools does not exist or is inconsequential. It also rejects the Supreme Court's explicit statement that, when the state conditions receipt of an important benefit program upon acceptance of such a government determination, it places "substantial pressure" on the individual to modify his behavior and "a burden upon religion exists." *Id.* at 718. "While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." *Id.*; *see also Abington Twp.*, 374 U.S. at 221.

Today's decision therefore raises very concrete concerns beyond our achieving substantive justice for the parties before us. What will the court now do when individuals identifying themselves as Anglican Catholics, Polish Catholics, or Orthodox Catholics seek to raise their children according to their own faith traditions? Barred from making any theological inquiry, will the court again rely on labels? What will it do when individuals identifying as Missouri Synod Lutherans seek to establish a facility separate from those identifying as Evangelical Lutherans? Will Methodists and United Methodists experience the same problem? As the ecumenical movement grows and individuals simply identify as "Christian," how will the court deal with the differences that still remain? Will the court recognize the right of those who identify as Orthodox Jews to nurture their faith in schools separate from Reformed or Liberal Jews? Other analogous situations surely will arise as society continues to grow more and more pluralistic in its religious beliefs. Today, the court simply puts these very pragmatic but important questions off for another day; it ignores that its label methodology is simply unworkable in these situations. The majority opinion "assume[s] that the Missouri Synods would be entitled to argue that they are a

different group from the Evangelicals, that the Orthodox Jews are entitled to argue that they are a different group from Reformed Jews, and that Shi'a Muslims can urge that they are different from Sunnis."[16] Why, then, is St. Augustine foreclosed from arguing that it is governed by a separate entity than that which governs St. Gabriel's?

Today's decision raises more than pragmatic problems. It raises haunting concerns about the future health of the Religion Clauses in this circuit. It is indeed difficult to square today's decision with the Supreme Court's recent reaffirmation that "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct 2012, 2019 (2017). It is equally difficult to square this decision with the basic tenet of the Supreme Court's Religion Clauses jurisprudence that the Constitution protects not only the "freedom to believe" but "the freedom to act." *Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940). Today's exercise in label reading is not consistent with our careful protection of the *individual* liberty to adhere to, and act on, one's *personal* religious beliefs. Accordingly, I respectfully dissent.

---

[16] Majority Op. 14.